UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ST. ANTHONY MEDICAL CENTERS, | No. 2:15-cv-01926-KJM-KJN |
| Plaintiff, | |
| v. | ORDER |
| KENT, et al., | |
| Defendants. | |

         Plaintiff St. Anthony Medical Centers ("St. Anthony"), a federally-qualified health center ("FQHC"), brings this action against the California Department of Health Care Services ("the Department") and Jennifer Kent, in her capacity as Director of the Department, seeking a declaration that it was a new FQHC for purposes of setting an initial prospective payment services ("PPS") rate for the Medi-Cal services it provided for the period beginning March 18, 2004, and an injunction requiring the Department to engage in the initial rate-setting process relating back to March 18, 2004. Before the court is defendants' motion to dismiss. ECF No. 10. Plaintiff opposes the motion. ECF No. 16. The court held a hearing on the matter on January 29, 2016, at which Kathryn Doi appeared for plaintiff and Karli Eisenberg appeared for defendants. Following the hearing, the court allowed plaintiff five days to provide additional authority in response to defendants' citation at the hearing of *Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012).

1

On February 3, 2016, plaintiff advised the court it did not have any additional authority to bring to the court's attention. ECF No. 21. As explained below, the court GRANTS defendants' motion to dismiss.

I.   BACKGROUND

   A.   Statutory Background

In 1965, Congress enacted Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*, known as the "Medicaid Act," to provide funding for state-administered Medicaid programs. *See* Compl. ¶ 9. The states, in accordance with federal law, determine eligibility of particular types of beneficiaries, types and ranges of services, payment levels, and administrative and operative procedures. *Id.* Payment for services is made directly by states to the individuals or entities that furnish the services. *Id.* (citing 42 C.F.R. § 430.0). A state's participation in the Medicaid program is voluntary, but when a state chooses to participate, it must comply with the provisions of the Medicaid Act and its implementing regulations. *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 935 (9th Cir. 2005). California participates in the Medicaid program through the California Medical Assistance Program ("Medi-Cal"), and has designated the Department as the agency responsible for its administration. *See* Cal. Welf. & Inst. Code §§ 10720, 14000 *et. seq.*; 22 Cal. Code Regs. tit. 22, §§ 50000 *et seq.*

The Omnibus Budget Reconciliation Act of 1989 ("OBRA 89") (P.L. 101-239) created the FQHC program, and made FQHC services mandatory. 42 U.S.C. § 1396d(a)(2)(C). FQHCs are health care providers located in medically underserved areas that receive Section 330 Public Health Service Act ("PHS") grants. *See id.* § 1396d(l). Other entities that meet the requirements for receiving a PHS grant ("FQHC look-alikes") also qualify as FQHCs. *Id.* § 1396d(l)(2)(B). Section 1396a(bb)(1) provides "the State plan shall provide for payment for services described in section 1396d(a)(2)(C) of this title furnished by a Federally-qualified health center." California Welfare & Institutions Code section 14132.100 reiterates that these services are covered Medi-Cal benefits and establishes a system for reimbursement for face-to-face encounters between an FQHC patient and a physician. Cal. Welf. & Inst. Code §§ 14132.100(a), (b), & (g).

1    Federal and state law require newly qualified FQHCs to have an initial year
2 reimbursement amount established.  42 U.S.C. § 1396a(bb)(4); Cal. Welf. & Inst.
3 §§ 14132.100(i)(1)(A), (i)(3).  California Welfare & Institutions Code section 14132.100(i)(1)
4 provides that newly licensed facilities added to existing FQHCs and entities that relocate to new
5 sites must also have their reimbursement rates newly assessed.  Federal and state law governing
6 Medi-Cal provides that the initial year reimbursement amount must be calculated based on the
7 average of the per-visit rates of other health centers located in the same or adjacent area with a
8 similar case load ("the Comparables Methodology").  42 U.S.C. § 1396a(bb)(4); Cal. Welf. &
9 Inst. §§ 14132.100(i)(1)(A), (i)(3) (FQHC rate, as implemented, is effective on the date that the
10 entity "was first qualified by the applicable federal agency as an FQHC . . .").  Federal and state
11 law also allow the use of alternative methodologies to the Comparables Methodology if they
12 (1) are agreed to by the state and the FQHC; and (2) result in payment to the FQHC of an amount
13 that is at least equal to the amount required to be paid using the Comparables Methodology.  42
14 U.S.C. § 1396a(bb)(6); Cal. Welf. & Inst. Code § 14132.100(i)(1)(D).

15    Once initial year rates are established, the rate is reassessed and increased annually
16 by the percentage increase in the Medicare Economic Index ("MEI") applicable to primary care
17 services for that fiscal year, and is adjusted to take into account any increase or decrease in the
18 scope of such services furnished by the FQHC during that fiscal year.  42 U.S.C. § 1396a(bb)(3).

19    B.    Factual Allegations and Claims

20    On September 11, 2015, St. Anthony filed the complaint in this action, which
21 makes the following allegations.  Compl., ECF No. 1.  St. Anthony previously qualified as an
22 FQHC look-alike.  *See id.* ¶ 21.  St. Anthony did not file its application for recertification with the
23 Health Resources and Services Administration ("HRSA"), so its FQHC status was terminated in
24 May 2003.  *Id.* ¶ 22.  Termination of its FQHC status resulted in termination of St. Anthony's
25 Medicare and Medicaid Provider Agreements.  *Id.*  St. Anthony was required to repay to the
26 Medi-Cal program the difference between its higher FQHC PPS rates and the lower Medi-Cal fee
27 for service rates for the period after its FQHC status was terminated.  *Id.*

28

1         In order to regain FQHC status for its clinic sites, St. Anthony was required to submit an initial FQHC designation application to HRSA. *Id.* ¶ 23. St. Anthony's application was approved by HRSA and the Centers for Medicare and Medicaid Services ("CMS") with an effective date of March 18, 2004. *Id.* ¶ 24. St. Anthony then reenrolled in Medicaid and Medicare as an FQHC. *Id.* ¶ 25. An e-mail from a CMS attorney to St. Anthony, dated April 1, 2004, advised: "St. Anthony's has received a 'new' designation therefore the State has to calculate its prospective payment system (PPS) visit rate to determine reimbursement as well as issue new provider numbers." *Id.* ¶ 26. St. Anthony submitted a cost report to the Department for the fiscal period ended June 30, 2004, and the Department rejected the report, stating that "[i]n order to establish the [PPS] rate, a full year cost report must be submitted for the clinics [sic] first full year; fiscal period ended June 30, 2005." *Id.* ¶ 27. Plaintiff interpreted the letter as confirming it was necessary to calculate a new PPS rate. *Id.* However, rather than establishing a new PPS for St. Anthony using the Comparables Methodology, the Department continued to reimburse St. Anthony at an interim rate based on the PPS rate it established for the earlier period of St. Anthony's FQHC designation, adjusted annually by the MEI. *Id.* ¶ 28.

        The complaint asserts a cause of action under 42 U.S.C. § 1983 based on a violation of 42 U.S.C. § 1396a(bb), requiring that a "State plan *shall* provide for payment for services . . . furnished by a Federally-qualified health center . . . in accordance with the provisions of this subsection." *Id.* ¶¶ 30–31 (quoting 42 U.S.C. § 1396a(bb)(1)) (emphasis in complaint). St. Anthony seeks a declaratory judgment that it was a new FQHC for purposes of setting an initial PPS rate for the period beginning March 18, 2004, and an injunction requiring the Department to engage in the initial rate-setting process for St. Anthony based on the Comparables Methodology relating back to March 18, 2004. *See id.* at 1.

II.     LEGAL STANDARD

        Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Dismissal can be based on the lack of a cognizable legal theory or the absence of

4

sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

Although a complaint need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to survive a motion to dismiss, this short and plain statement "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation" or "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint will survive a motion to dismiss for failure to state a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In making this context-specific evaluation, this court must construe the complaint in the light most favorable to the plaintiff and accept as true the factual allegations of the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007).

III.    DISCUSSION

The parties agree that, because 42 U.S.C. § 1983 contains no specific statute of limitations, federal courts borrow state statutes of limitations for personal injury actions. *Wallace v. Kato*, 549 U.S. 384, 387 (2007); *see Taylor v. Regents of Univ. of Cal.*, 993 F.2d 710, 711 (9th Cir. 1993). Under California law, this period is two years. *Cology Cove Props., LLC v. City of Carson*, 640 F.3d 948, 956 (9th Cir. 2011). Although state law determines the length of the limitations period, federal law determines when a cause of action accrues. *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001). "A federal claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991) (internal quotation marks and citation omitted). A claim may be dismissed under Rule 12(b)(6) where the facts and dates alleged in the complaint establish that the claim is barred by the applicable statute of limitations. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010).

1     Here, the complaint challenges defendants' refusal to establish a new initial PPS
2 rate for the period beginning March 18, 2004.  *See* Compl. at 1, ¶¶ 21–29.  Plaintiff seeks a
3 declaration that it was entitled to a new initial PPS rate for the period beginning March 18, 2004,
4 and an injunction enjoining the Department from continuing to violate the Medicaid Act.  In
5 effect, plaintiff seeks to require the Department to set a new PPS rate relating back to March 18,
6 2004.  *See id.* at 1.  Plaintiff did not file the instant action until September 11, 2015, more than ten
7 years after it was recertified as an FQHC.  Plaintiff's allegations establish plaintiff knew or had
8 reason to know of the injury since 2005, when the Department continued to reimburse St.
9 Anthony at an interim rate based on its earlier PPS rate rather than establishing a new PPS based
10 on the full year cost report for the fiscal period ended June 30, 2005.  *See id.* ¶¶ 27–28.
11 Accordingly, it is apparent from the face of the complaint that the action is time barred under the
12 applicable two-year statute of limitations.  *See Von Saher*, 592 F.3d at 969.

13     The court is not persuaded by plaintiff's argument that defendants' acts after 2004
14 constitute a continuing violation or separate violations of the Medicaid Act that bring the action
15 within the limitations period.  The Ninth Circuit has held the continuing violation theory applies
16 to § 1983 actions.  *Knox*, 260 F.3d at 1013 (citing *Gutowsky v. Cty. of Placer*, 108 F.3d 256, 259
17 (9th Cir. 1997)).  Courts have recognized two methods of establishing a continuing violation:
18 (1) showing a serial violation by pointing to a series of related acts against one individual, of
19 which at least one falls within the relevant period of limitations; or (2) showing a systematic
20 unlawful policy or practice that operated, in part, within the limitations period.  *Douglas v.*
21 *California Dep't of Youth Auth.*, 271 F.3d 812, 822 (9th Cir. 2001).

22     In *Pouncil v. Tilton*, the case cited by defense counsel at hearing, the Ninth Circuit
23 articulated a new framework for interpreting precedent on the continuing violation doctrine.
24 704 F.3d 568, 576–81 (9th Cir. 2012); *accord Ervine v. Desert View Reg'l Med. Ctr. Holdings,*
25 *LLC*, 753 F.3d 862, 870 (9th Cir. 2014).  According to *Pouncil*, courts must determine which of
26 two lines of authority applies to the facts of the case: *Knox v. Davis* and *Delaware State*
27 *College v. Ricks*, 449 U.S. 250 (1980), or *National Railroad Passenger Corp. v. Morgan*,
28

6

1  536 U.S. 101 (2002), and *Cherosky v. Henderson*, 330 F.3d 1243 (9th Cir. 2003). *See Pouncil*,
2  704 F.3d at 581.

3   *Knox* and *Ricks* stand for the proposition that the inevitable effects of a prior
4  decision do not constitute a continuing violation. *See Pouncil*, 704 F.3d at 577–78. In *Knox*, an
5  attorney was notified that her legal mail and visitation privileges at all California Department of
6  Corrections (CDC)[1] facilities were suspended. 260 F.3d at 1013. The attorney argued each time
7  she was denied access to one of her clients housed in a CDC facility due to her suspension, a new
8  cause of action arose under the continuing violation theory. *Id.* The court held the continuing
9  violation doctrine was inapplicable, because the attorney failed to establish that a new violation
10 occurred each time she was denied her visitation or mail privileges. *Id.* "Rather, the CDC's
11 subsequent and repeated denials of [her] privileges with her clients [was] merely the continuing
12 effect of the original suspension." *Id.* In *Ricks*, the Supreme Court explained that the emphasis in
13 the statute of limitations analysis is not on the effects of earlier decisions, but on "whether any
14 present *violation* exists." 449 U.S. at 258 (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553,
15 558 (1977) (emphasis in *Evans*)).

16  At the same time, *Morgan* and *Cherosky* establish that independent, wrongful,
17 discrete acts re-start the running of a limitations period. *See Pouncil*, 740 F.3d at 579. In
18 *Morgan*, the plaintiff filed a charge of discrimination and retaliation against his employer. 536
19 U.S. at 105. Some of the allegedly discriminatory acts occurred within the limitations period, but
20 many took place prior to that time period. *Id.* at 106. The court held "[e]ach discrete
21 discriminatory act start[ed] a new clock for filing charges alleging that act." *Id.* at 113. In
22 *Cherosky*, postal employees challenged the U.S. Postal Service's denial of their requests for
23 respirators. 330 F.3d at 1247. The Ninth Circuit concluded the heart of the claim did not stem
24 from the policy regarding the use of respirators, but rather from the discrete, individualized

---

[1] The CDC has since been renamed the California Department of Corrections and Rehabilitation (CDCR).

7

decisions that resulted from implementing the policy.  *Id.*  As a result, the court held each incident constituted a separate actionable act of discrimination.  *Id.*

Here, the court finds the facts of this case fall under the *Knox*/*Ricks* line of authority as inevitable, continuing effects of a prior decision.  The complaint itself makes clear that the action arises out of defendants' discrete decision to not establish a new initial PPS rate for St. Anthony in 2004.  The complaint does not allege defendants took any acts that violated the Medicaid Act after 2004.  As described above, OBRA provides,

> **(3) Fiscal year 2002 and succeeding fiscal years**
>
> . . . [T]he State plan shall provide for payment for such services in an amount . . . that is equal to the amount calculated for such services under this subsection for the preceding fiscal year—
>
>> (A) increased by the percentage increase in the MEI . . . applicable to primary care services . . . for that fiscal year; and
>>
>> (B) adjusted to take into account any increase or decrease in the scope of such services furnished by the center or clinic during that fiscal year.

42 U.S.C. § 1396a(bb)(3).  Here, plaintiff does not allege defendants, in calculating the rates for any year after 2004, increased the rate of the preceding year by an incorrect MEI percentage or failed to adjust the rate to take into account a change in the scope of services furnished under § 1396a(bb)(3).  The sole complaint is that the initial base rate established in 2004 was incorrect under § 1396a(bb)(4), which, as a result of the formula for calculating payments, inherently led all subsequent payments to be incorrect.  Under *Knox*, the court finds the allegedly incorrect subsequent payments constitute inevitable continuing effects of the 2004 decision, rather than independent subsequent violations or continuing unlawful practices.  *See* 260 F.3d at 1013–15.

The cases cited by plaintiff do not alter the court's analysis.  The first case plaintiff cites, *Telerian Corp. v. International Brotherhood of Electrical Workers, Local No. 6*, 977 F.2d 591 (9th Cir. 1992), is an unpublished memorandum that provides little factual background or analysis.  The second case, *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133 (9th Cir. 2002), involved claims brought under the Americans with Disabilities Act for continuing discriminatory conditions.  The *Pickern* court found a continuing violation based on the specific language of

8

42 U.S.C. § 12188(a)(1), which provides injunctive relief is available to "any person who *is being subjected to* discrimination on the basis of disability . . . or who has reasonable grounds for believing that such person *is about to be subjected to* discrimination." *Id.* at 1136 (emphasis in *Pickern*). The court reasoned, "[s]o long as the discriminatory conditions continue, and so long as a plaintiff is aware of them and remains deterred, the injury under the ADA continues," and the plaintiff is entitled to injunctive relief. *Id.* at 1137. The court does not find the reasoning of *Pickern* applicable here. Moreover, both of these cases were resolved prior to the Ninth Circuit's decision in *Pouncil* in 2012. After being provided the opportunity, as noted, plaintiff has not brought any additional authority to the court's attention in response to defendants' citation of *Pouncil*.

Because the court finds the matter is time barred, the court does not reach defendants' other arguments.

IV. CONCLUSION

For the foregoing reasons, the court GRANTS defendants' motion to dismiss the complaint. Given the liberal amendment policy embodied in the Federal Rules of Civil Procedure, the court grants leave to amend if plaintiff can do so consonant with Rule 11. *See* Fed. R. Civ. P. 15. Any such amendment shall be made within 14 days of the date this order is filed.

IT IS SO ORDERED.

DATED: March 1, 2016.

_____
UNITED STATES DISTRICT JUDGE